**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| PHOENIX ENTERTAINMENT PARTNERS, LLC, <br><br>      Plaintiff, <br><br> v. <br><br> BRIAN HEISLER d/b/a YOUR DJ PROS and CENTENNIAL LANES, INC. <br><br>      Defendants. | Case No.: 1:15-cv-11191 |

## COMPLAINT

    The Plaintiff, Phoenix Entertainment Partners, LLC ("PEP"), by its undersigned counsel, hereby complains of Brian Heisler d/b/a Your DJ Pros and Centennial Lanes, Inc. for its Complaint hereby alleges as follows:

## JURISDICTION AND VENUE

    1.    This is an action for trademark infringement and unfair competition arising under 15 U.S.C. §§ 1114 and 1125 as well as 815 ILCS § 510/1 et seq. This Court has exclusive jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, in that this is a civil action arising under the laws of the United States.

    2.    This Court further has jurisdiction pursuant to 28 U.S.C § 1338(a), in that this civil action arises under an Act of Congress relating to trademarks, and, as to PEP's Lanham Act unfair competition claim, pursuant to 28 U.S.C. § 1338(b), in that the claim is joined with a substantial and related claim under the trademark laws of the United States.

3.      This Court has supplemental jurisdiction over the subject matter of PEP's state law claim pursuant to 28 U.S.C. § 1367(a), in that the claim is so related to PEP's federal claims that they form part of the same case or controversy.

4.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b), because all of the Defendants reside in the State of Illinois and reside in this Division and elsewhere in this Judicial District.

5.      This Court has personal jurisdiction over each Defendant, in that each of them resides in this State and federal judicial district and conducts significant business here, and in that the acts of which the Defendants stand accused were undertaken in this State and federal judicial district.

## THE PLAINTIFF

6.      Plaintiff PEP is a North Carolina LLC having its principal place of business in Pineville, North Carolina.

## THE DEFENDANTS

7.      Defendant Brian Heisler ("Heisler") is an individual that does business as Your DJ Pros and has provided karaoke entertainment to certain venues including Centennial Lanes in Tinley Park, Illinois.

8.      Defendant Centennial Lanes, Inc. ("Centennial") is an Illinois Corporation that operates a lounge bar called Jason Witherspoon's Saloon as part of Centennial Lanes in Tinley Park, Illinois.   Centennial operates a commercial establishment that provides karaoke entertainment to its patrons as an inducement for their patronage and purchase of food, drink, and other concessions.

## BACKGROUND FACTS

9.      Karaoke is a popular form of participatory entertainment commonly found in bars and restaurants and other types of venues throughout the United States.

10.      The basic premise of a karaoke show is that the entity hosting the show provides patrons with access to a sound system and specially prepared karaoke accompaniment tracks, so that individual patrons may perform for the crowd.

11.      Generally, a "karaoke accompaniment track" is a re-recorded version of a popular song without the lead vocals in a specialized format that includes a graphical component containing a lyric display, cueing information, and other information.  The graphical component is synchronized to the music and is displayed to the patron who is performing and, typically, to the crowd as well.

12.      Venues that offer karaoke entertainment do so primarily as a free service, but with the commercial purpose of enticing patrons to come to their establishments and purchase food and beverages.

13.      The purchase and consumption of alcoholic beverages in connection with karaoke shows is particularly encouraged to enable patrons to overcome inhibitions against singing in public.

14.      PEP is the owner of SOUND CHOICE, a well-known and leading brand of karaoke accompaniment tracks that is particularly well known to commercial karaoke operations including bars, restaurants, and other venues as described above.

15.      PEP has succeeded Slep-Tone Entertainment Corporation ("Slep-Tone"), by assignment, in all interest in the SOUND CHOICE brand.

16.     Over the course of nearly three decades in business, Slep-Tone re-recorded and released in excess of 16,500 SOUND CHOICE-branded popular songs on special compact discs known as CD+G ("compact disc plus graphics") discs and, more recently, a subset of that catalog in another common karaoke format, MP3+G ("MP3 plus graphics").

17.     SOUND CHOICE-branded karaoke tracks are wildly popular among karaoke entertainment providers, patrons, and home consumers. According to some estimates, more than half of all accompaniment tracks played at karaoke shows in the United States originated from Slep-Tone's recordings.

18.     The popularity of SOUND CHOICE karaoke tracks derives from the market's perception that the recordings are usually the most faithful to the sound of the original recording artist, a characteristic highly valued by karaoke singers.

19.     SOUND CHOICE karaoke tracks are also perceived by the market as providing highly accurate singing cues as part of the video display, a characteristic that is also highly valued by karaoke singers.

20.     Slep-Tone and its successor PEP have released their karaoke tracks for commercial users <u>only</u> on compact discs[1] and not on any other form of carrier (such as computer hard drives or through internet downloads).

21.     Over time, however, it has become technologically possible to create karaoke accompaniment tracks, using the SOUND CHOICE CD-based tracks as a template, for storage on alternative media, such as computer hard drives.

22.     In most cases, the creation of such non-original tracks results in an imitation of a SOUND CHOICE track, which imitation is inferior to the original because of digital compression

---

[1] In the beginning, Slep-Tone released its karaoke tracks on cassette tapes as well, but that technology was focused on the home consumer and has since become fully obsolete.

of the data as the format is converted from native CD+G audio and graphics to compressed audio and graphics.

23. In a typical bar or restaurant environment, because the imitation tracks still bear the SOUND CHOICE trademarks and use the protectable trade dress, when the tracks are used, the SOUND CHOICE trademarks and trade dress are broadcast, published, and advertised to the general public or specific market segment to advertise the establishment's goods, products or services for the purpose of attracting customers or supporters. As a result, the bar or restaurant infringes the trademarks and trade dress when it advertises and promotes karaoke services which infringe the trademarks and trade dress.

24. The process outlined above is known as "media-shifting," because the information is being copied or shifted from one medium to another, and "format-shifting," because the information is being copied or shifted from one format to another.

25. Media-shifting and format-shifting are undertaken for a number of purposes, some reasonable and others illicit.

26. Users of karaoke accompaniment tracks usually find that the use of media-shifted tracks provides them with greater ease of use of the content, which can be stored on a hard drive and accessed quickly without having to insert discs into a player, and can protect the user's discs from excessive wear, damage, loss, or theft.

27. Prior to 2007, to maintain the quality of the goods and services offered in connection with the SOUND CHOICE Marks, Slep-Tone prohibited media-shifting and format-shifting of its products entirely, and its products carried warnings against the unauthorized duplication that media-shifting and format-shifting require.

28.     In order to enable legitimate owners of original discs the convenience of format-shifting and media-shifting, starting in 2009, Slep-Tone instituted a Media Shifting Policy ("MSP")—which PEP has continued—whereby legitimate owners could gain permission for media-shifting and format-shifting.

29.     That policy requires disc owners to notify Slep-Tone of their intent to media-shift, or that they have completed a media-shift.

30.     That policy also requires disc owners to maintain a condition known as "1-to-1 correspondence" between the discs they own and the media (such as hard drives) to which they media-shift.

31.     For example, a disc owner who wants to have two hard drives with the same media-shifted content, the disc owner must own two original discs representing that content.

32.     The policy also requires disc owners to undergo an audit of their holdings to verify 1-to-1 correspondence and the integrity and quality of the media-shifted tracks.

33.     The policy also requires disc owners to maintain ownership and possession of the discs and to put discs from which content has been media-shifted "on the shelf," i.e., out of use of any type while the content is media-shifted.

34.     Unfortunately, easy electronic duplication of media-shifted tracks has resulted in the widespread distribution of media-shifted karaoke tracks unaccompanied by the ownership of any discs at all, and without any regard to the quality of the duplicated tracks.

35.     This distribution allows karaoke accompaniment track users to gain the benefit of what appear to be Slep-Tone karaoke tracks without paying for original discs.

36.     Karaoke accompaniment track users have used the available technology to place the duplicated contents of one purchased disc on two or more computer systems for simultaneous

use; to place the duplicated contents of their patrons' discs on their own computer hard drives at a show; to "swap" song files with other users; to obtain and share karaoke tracks via file-sharing sites and torrents; to purchase computer hard drives that were pre-loaded with duplicates of karaoke tracks; and to sell any original media they might have owned in the secondary market once they have media-shifted.

37. None of these activities are conducted with PEP's authorization, and none of these activities are accompanied by any sort of payment to PEP.

38. Instead, these activities have driven the demand for original discs down to uneconomically feasible levels, because it has become relatively easy to obtain illicitly, for free or at a nominal cost, products that if legitimate would cost tens of thousands of dollars when purchased at retail.

## THE RIGHTS OF THE PLAINTIFF

39. PEP is the owner of U.S. Trademark Registration No. 1,923,448, issued October 3, 1995, and renewed once, for the trademark SOUND CHOICE, for "pre-recorded magnetic audio cassette tapes and compact discs containing musical compositions and compact discs containing video related to musical compositions."

40. PEP is the owner of U.S. Trademark Registration No. 2,000,725, issued September 17, 1996, and renewed once, for a display trademark as follows:



for "pre-recorded magnetic audio cassette tapes and compact discs containing musical compositions and compact discs containing video related to musical compositions."

41.    PEP is the owner of U.S. Service Mark Registration No. 4,099,045, issued February 14, 2012, for the trademark SOUND CHOICE, for "conducting entertainment exhibitions in the nature of karaoke shows."

42.    PEP is the owner of U.S. Service Mark Registration No. 4,099,052, issued February 14, 2012, for the same display trademark as in the preceding paragraph for "conducting entertainment exhibitions in the nature of karaoke shows."

43.    PEP and its predecessor have, for the entire time its marks identified above ("the SOUND CHOICE Marks") have been federally registered, provided the public, including the Defendants with notice of those federal registrations through the consistent display of the symbol ® with its marks as used.

44.    PEP is the owner of distinctive and protectable trade dress associated with its graphical displays ("the Trade Dress").  This distinctive and protectable trade dress includes, at a minimum, (a) the use of a particular typeface, style, and visual arrangement in displaying the lyrics; (b) the SOUND CHOICE Marks; and (c) the use of particular styles in displaying entry cues for singers, namely a series of vanishing rectangles to indicate the cue.

45.    PEP and its predecessor have used its trade dress continuously and substantially exclusively for a period of decades.

46.    The individual and collected elements of the Trade Dress have acquired secondary meaning as an indicator of PEP and its predecessor as a source, effectively functioning as a visual trademark.

47.    The aforementioned trade dress serves to distinguish PEP's tracks from the tracks of their competitors, such that persons who are even minimally frequent consumers of karaoke entertainment services such as those provided by Heisler and Centennial are capable of identifying

a particular karaoke track as originating with PEP simply by examining the Trade Dress or any significant portion thereof, whether or not the SOUND CHOICE Marks are also displayed.

48.     The elements of the Trade Dress represent specific design choices by Slep-Tone; they are but three of many ways to convey the information necessary to permit a karaoke singer to be appropriately supported in his or her performance.

49.     No competitor of PEP is required to use any element of the Trade Dress to accomplish the lyric cueing, and indeed all of the Plaintiff's known competitors are known to use other trade dress in accomplishing the lyric cueing.

<u>**ACTIVITIES OF DEFENDANT BRIAN HEISLER**</u>

50.     Brian Heisler provides karaoke services to Centennial Lanes operated by Defendant Centennial Lanes, Inc.

51.     On information and belief, in order to provide services, rather than using original karaoke discs that he possesses (if he indeed possesses such discs), Heisler relies upon one or more computer hard drives that store files representing karaoke accompaniment tracks.

52.     On information and belief, Heisler relies upon at least one such computer hard drive described in paragraph 50 herein.

53.     On information and belief, Heisler created, or directed another to create, or otherwise acquired from a third party the files that are stored on his computer hard drive(s).

54.     On information and belief, Heisler does not maintain a 1:1 correspondence relationship between his hard drives and original discs he might have lawfully acquired.

55.     PEP or Slep-Tone did not authorize, cause, control, or know about the creation of the files stored on Heisler's computer hard drives at the time those files were so stored.

56.     On information and belief, many of the files stored on the Heisler's computer hard drives are representative of karaoke tracks originally created by Slep-Tone and are marked with the SOUND CHOICE Marks, and where obtained or duplicated without any regard to the quality of the tracks.

57.     When played as intended using appropriate software, those files cause the SOUND CHOICE Marks and the Trade Dress to be displayed as part of the associated video component of the karaoke tracks they represent. As a result, when the tracks are used, the SOUND CHOICE trademarks and Trade Dress are broadcast or published to the general public or specific market segment to advertise the Defendant's goods, products or services for the purpose of attracting customers or supporters.

58.     Neither PEP nor Slep-Tone authorized Heisler to create or use karaoke accompaniment tracks or computer files representative of karaoke accompaniment tracks that bear the SOUND CHOICE Marks or the Trade Dress. Neither PEP nor Slep-Tone authorized Heisler to conduct entertainment services in the nature of Karaoke shows in connection with the SOUND CHOICE Marks or the Trade Dress to the general public.

59.     As such, the placement of the SOUND CHOICE Marks and the Trade Dress upon Heisler's computer files is a false designation of the origin of those computer files.

60.     At all times relevant to the causes of action stated herein, Heisler has known that the creation and use of karaoke accompaniment tracks or computer files representative of karaoke accompaniment tracks that bear the SOUND CHOICE Marks and/or the Trade Dress is not authorized.

61.     Heisler's files, which function as karaoke accompaniment tracks, are also counterfeits of genuine SOUND CHOICE-branded tracks.

62.     A patron or unwitting customer of Heisler, when confronted with the display of the SOUND CHOICE Marks and the Trade Dress at one of Heisler's shows, is likely to be confused into believing, falsely, that Slep-Tone or PEP created the tracks in use or authorized their creation. In addition, the patron or customer, when confronted with the display of the SOUND CHOICE Marks during the karaoke show, is likely to be confused into believing, falsely, that Slep-Tone or PEP authorized the entertainment exhibition in the nature of the karaoke shows.

63.     Heisler's use of the computer files representative of karaoke accompaniment tracks is commercial in nature because he is paid to provide access to and play those computer files and tracks at karaoke shows.

64.     Additionally, even if a particular counterfeit track is not played at a given show, the act of making that track available for play at a show is a commercial act for which Heisler is compensated and which inure to his benefit.

65.     On information and belief, Heisler's piracy of accompaniment tracks is not limited to SOUND CHOICE tracks, but extends to the piracy of numerous other manufacturers' tracks as well, on the same terms as above.

66.     The SOUND CHOICE Marks were displayed on video monitors during various songs played by Heisler.

67.     PEP obtained photographs and videos of displays of the SOUND CHOICE Marks being used during the entertainment exhibitions in the nature of karaoke shows conducted by Heisler at Centennial after the establishment received notice of potential acts of illegal trademark infringement and unfair competition.

68.     Heisler has not complied with PEP's MSP, and therefore his use of the SOUND CHOICE Marks was not authorized proper use.

## ACTIVITIES OF DEFENDANT CENTENNIAL LANES, INC.

69. Centennial hired Heisler to provide commercial karaoke services at its lounge bar.

70. Centennial has the right and ability to control whether its contractors use authentic or counterfeit materials to provide services.

71. PEP or its representatives informed Centennial of the infringing and counterfeit character of the entertainment exhibitions in the nature of karaoke shows being conducted by Centennial's contractor on or about October 14, 2015.

72. PEP offered Centennial the opportunity to enter into its Verified Compliance Safe Harbor Program, which is a free program that protects venues from liability for the acts of its contractors in exchange for requiring its contractors to provide information about their karaoke systems to enable PEP to assess whether those contractors are operating legally.

73. PEP also provides a certification program to karaoke operators as a means by which venues can determine, without significant inquiry, whether the karaoke operator they wish to hire is using authentic materials.

74. As a result of PEP's efforts, through its predecessor Slep-Tone, Centennial has actual knowledge of the infringing and counterfeit nature of Heisler's karaoke materials.

75. Despite that knowledge, Centennial refused to terminate Heisler's services and continued to use Plaintiff's SOUND CHOICE trademarks in connection with entertainment exhibitions in the nature of karaoke shows at its establishment.

76. Despite that knowledge, Centennial continued to receive a financial benefit from the provision of infringing karaoke services at their establishments by Heisler, through the attraction of paying patrons to their establishments.

77.     In addition, because the imitation tracks still bear the SOUND CHOICE trademarks and use the protectable trade dress, when the tracks are used, the SOUND CHOICE trademarks and trade dress are broadcast, published, and advertised to the general public or specific market segment to advertise the Centennial's goods, products or services for the purpose of attracting customers or supporters. This provided further financial gain to Centennial.

78.     As such, Centennial operated in actual or apparent partnership with Heisler, in a symbiotic relationship from which both benefit.

79.     Centennial is liable for the acts of trademark infringement directly engaged in by Heisler on their respective premises or for their benefit.

**<u>DAMAGES</u>**

80.     Heisler's unauthorized use of PEP's trademarks has damaged PEP.  Heisler has enjoyed years of revenues attributable in substantial part to its use of counterfeit SOUND CHOICE-branded karaoke tracks to provide karaoke services for money.

81.     Heisler's illicit activities have also allowed him to compete unfairly against PEP's legitimate customers and licensees by lowering his cost of doing business through piracy of the music materials he uses.

82.     Those illicit activities exerted illegitimate and unfair pressure upon the market for karaoke services in the areas in which Heisler operates by helping to crowd higher-cost but legitimate operators, such as licensees of PEP, out of the market.

83.     Heisler's acts deprived PEP of revenue by discouraging legitimate operators from investing in legitimate SOUND CHOICE-branded products. In addition, it deprived PEP of the ability to control the nature and quality of the goods and services used in connection with PEP's SOUND CHOICE Marks.

84. Centennial's unauthorized use of and benefit from the use of the SOUND CHOICE Marks have damaged PEP both in the aggregate and individually. In addition, it deprived PEP of the ability to control the nature and quality of the goods and services used in connection with PEP's SOUND CHOICE Marks.

85. Centennial's unauthorized use of and benefit from the use of the SOUND CHOICE Marks have damaged PEP both in the aggregate and individually. In addition, it deprived PEP of the ability to control the nature and quality of the goods and services used in connection with PEP's SOUND CHOICE Marks.

86. The Defendants have damaged PEP in an amount of at least $50,000.

87. Moreover, by exerting illegitimate and unfair pressure upon the market for karaoke services in this State and judicial district through the use of pirated material belonging to PEP and to other manufacturers, the Defendants have cost PEP in excess of $50,000 in revenue from legitimate sources crowded out of the market by the Defendants' piracy.

**FIRST CLAIM FOR RELIEF**
**TRADEMARK AND TRADE DRESS INFRINGEMENT**
**AGAINST DEFENDANT BRIAN HEISLER**

88. PEP repeats and incorporates by reference herein its allegations contained in the above paragraphs of this Complaint.

89. Heisler used and knowingly directly benefited from the use of a reproduction, counterfeit, or copy of the SOUND CHOICE Marks or the Trade Dress in connection with the provision of services including karaoke services, by manufacturing or acquiring the reproduction, counterfeit, or copy of the SOUND CHOICE Marks or the Trade Dress, and by displaying the reproduction, counterfeit, or copy of the SOUND CHOICE Marks or the Trade Dress during the provision of those services.

90.     Heisler's use of the SOUND CHOICE Marks was "in commerce" within the meaning of the Trademark Act of 1946 as amended.

91.     PEP did not license Heisler to make, acquire, or use reproductions, counterfeits, or copies, or to use the SOUND CHOICE Marks in connection with the services provided at Centennial.

92.     Use of the SOUND CHOICE Marks in the manner attributable to Heisler is likely to cause confusion, or to cause mistake, or to deceive customers at the venue in which Heisler performs into believing that the services those customers are receiving are being provided with the authorization of PEP using bona fide, legitimate, authorized karaoke accompaniment tracks and entertainment exhibitions in the nature of karaoke shows.

93.     Heisler's acts were willful and knowing.

94.     PEP has been damaged by infringing activities of Heisler.

95.     Unless enjoined by the Court, Heisler's infringing activities as described above will continue unabated and will continue to cause harm to PEP.

**SECOND CLAIM FOR RELIEF**
**UNFAIR COMPETITION UNDER 15 U.S.C. § 1125(a)**
**AGAINST DEFENDANT BRIAN HEISLER**

96.     PEP repeats and incorporates by reference herein its allegations contained in the above paragraphs of this Complaint.

97.     On each occasion when Heisler caused or permitted a SOUND CHOICE-branded accompaniment track to be played during a karaoke show, Heisler caused or permitted the display of the SOUND CHOICE Marks in connection with Heisler's karaoke entertainment.

98.     The display of the SOUND CHOICE Marks is likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be

deceived into believing, falsely, that PEP sponsored or approved Heisler's services and commercial activities.

99.     The display of the SOUND CHOICE Marks is also likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the works being performed were sold by PEP and purchased by Heisler for use in providing karaoke entertainment services.

100.     Heisler's use of the SOUND CHOICE Marks in this fashion would have inured to the benefit of PEP if Heisler had legitimately acquired genuine SOUND CHOICE discs instead of counterfeiting them or acquiring counterfeit copies, in that PEP would have received revenue from such sales.

101.     Because PEP has been denied this revenue, it has been damaged by Heisler's uses.

102.     On each occasion when Heisler displayed an accompaniment track pirated from another manufacturer to be played during a karaoke show, Heisler caused the display of the words, names, and symbols of the other manufacturer in connection with Heisler's karaoke services.

103.     The display of these false designations of origin is likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the pirated tracks are legitimate, authorized, and authentic materials that Heisler acquired in a legitimate manner.

104.     The display of the false designations of origin is also likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the works being performed were sold by those manufacturers and purchased by Heisler.

105.     Heisler's use of the false designations of origin in this fashion damages PEP by enabling Heisler to provide karaoke entertainment services at a lower cost than persons who acquire those materials legitimately, including PEP's legitimate customers.

106.     The consequential denial of revenue from a legitimate market for PEP's customers' services prevents Slep-Tone's customers from making purchases of material from PEP and is thus a denial of revenue to PEP.

107.     Because PEP has been denied this revenue, it has been damaged by Heisler's false designations of origin relating to other manufacturers.

108.     Unless enjoined by the Court, Heisler's unfair competition activities as described above will continue unabated and will continue to cause harm to PEP.

### THIRD CLAIM FOR RELIEF
### ILLINOIS DECEPTIVE TRADE PRACTICES ACT
### AGAINST DEFENDANT BRIAN HEISLER

109.     PEP repeats and incorporates by reference herein its allegations contained in the above paragraphs of this Complaint.

110.     Heisler used and knowingly directly benefited from the use of a reproduction, counterfeit, or copy of the SOUND CHOICE Marks or the Trade Dress in connection with the provision of services including karaoke shows, by manufacturing or acquiring the reproduction, counterfeit, or copy of the SOUND CHOICE Marks or the Trade Dress, and by displaying the reproduction, counterfeit, or copy of the SOUND CHOICE Marks or the Trade Dress during the provision of those services.

111.     Heisler's acts of infringement occurred during the conduct of trade or commerce, from which Heisler derived an economic benefit.

112.    Heisler's acts of infringement constitute unfair or deceptive acts or practices within the meaning of 815 ILCS § 510/1 et seq.

113.    Heisler's acts of infringement cause likelihood of confusion or of misunderstanding as to affiliation, connection, or association with or certification by PEP.

114.    As a direct and proximate result of each of Heisler's acts of infringement, PEP has suffered a pecuniary loss, including the loss of revenue associated with sales or distribution of compact discs to karaoke jockeys and the exhibition of karaoke shows, commensurate with the demand for the contents of those discs, which revenue would have been received but for Heisler's acts in creating or acquiring counterfeits of SOUND CHOICE-branded accompaniment tracks and conducting entertainment exhibitions in the nature of karaoke shows.

115.    As such, PEP has been damaged and is likely to be further damaged by a deceptive trade practice of Heisler within the meaning of 815 ILCS § 510/3.

116.    Unless enjoined by the Court, Heisler's unfair competition activities as described above will continue unabated and will continue to cause harm to PEP.

**FOURTH CLAIM FOR RELIEF**
**COMMON LAW UNFAIR COMPETITION**
**AGAINST DEFENDANT BRIAN HEISLER**

117.    PEP repeats and incorporates by reference herein its allegations contained in above paragraphs of this Complaint.

118.    Heisler used and knowingly directly benefited from the use of a reproduction, counterfeit, or copy of the SOUND CHOICE Marks or the Trade Dress in connection with the provision of services including karaoke services, by manufacturing or acquiring the reproduction, counterfeit, or copy of the SOUND CHOICE Marks or the Trade Dress, and by displaying the

reproduction, counterfeit, or copy of the SOUND CHOICE Marks or the Trade Dress during the provision of those services.

119.    Heisler's use of the SOUND CHOICE Marks was "in commerce" within the meaning ascribed by Illinois common law.

120.    PEP did not license Heisler to make, acquire, or use reproductions, counterfeits, or copies, or to use the SOUND CHOICE Marks in connection with the services provided to Centennial.

121.    Use of the SOUND CHOICE Marks in the manner attributable to Heisler is likely to cause confusion, or to cause mistake, or to deceive customers at the venue in which Heisler performs into believing that the services those customers are receiving are being provided with the authorization of PEP using bona fide, legitimate, authorized karaoke accompaniment tracks.

122.    Heisler's acts were willful and knowing.

123.    PEP has been damaged by infringing activities of Heisler.

Unless enjoined by the Court, Heisler's infringing activities as described above will continue unabated and will continue to cause harm to PEP

### FIFTH CLAIM FOR RELIEF
### TRADEMARK AND TRADE DRESS INFRINGEMENT
### AGAINST DEFENDANT CENTENNIAL LANES, INC.

124.    PEP repeats and incorporates by reference herein its allegations contained in the above paragraphs of this Complaint.

125.    Centennial knowingly directly benefited from the use of, and through Heisler, used a reproduction, counterfeit, or copy of the SOUND CHOICE Marks in connection with the provision of karaoke entertainment services, by displaying and permitting to be displayed the reproduction, counterfeit, or copy of the SOUND CHOICE Marks during the provision of those

services. In addition, because the imitation tracks still bear the SOUND CHOICE trademarks and use the protectable trade dress, when the tracks are used, the SOUND CHOICE trademarks and trade dress are broadcast, published, and advertised to the general public or specific market segment to advertise Centennial's goods, products or services for the purpose of attracting customers or supporters. This provided further financial gain to Centennial.

126.     Centennial's use of the SOUND CHOICE Marks was "in commerce" within the meaning of the Trademark Act of 1946 as amended.

127.     PEP did not license Centennial to make, acquire, or use reproductions, counterfeits, or copies, or to use the SOUND CHOICE Marks in connection with the services provided at its lounge.

128.     Use of the SOUND CHOICE Marks in the manner attributable to Centennial is likely to cause confusion, or to cause mistake, or to deceive Centennial's customers into believing that the services those customers are receiving are being provided with the authorization of PEP using bona fide, legitimate, authorized karaoke accompaniment tracks.

129.      Centennial's acts were willful and knowing.

130.     PEP has been damaged by infringing activities of Centennial.

131.     Unless enjoined by the Court, Centennial's infringing activities as described above will continue unabated and will continue to cause harm to PEP.

**SIXTH CLAIM FOR RELIEF**
**UNFAIR COMPETITION UNDER 15 U.S.C. § 1125(a)**
**AGAINST DEFENDANT CENTENNIAL LANES, INC.**

132.     PEP repeats and incorporates by reference herein its allegations contained in the above paragraphs of this Complaint.

133.    On each occasion when Centennial permitted a SOUND CHOICE-branded accompaniment track to be played during a karaoke show, Centennial permitted the display of the SOUND CHOICE Marks in connection with Heisler's karaoke entertainment services.

134.    The display of the SOUND CHOICE Marks is likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that PEP sponsored or approved Centennial's services and commercial activities.

135.    The display of the SOUND CHOICE Marks is also likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the works being performed were sold by PEP and purchased by Heisler for use in providing karaoke entertainment services in a venue of Centennial's.

136.    Centennial's use of the SOUND CHOICE Marks in this fashion would have inured to the benefit of PEP if Heisler had legitimately acquired genuine SOUND CHOICE discs instead of counterfeiting them or acquiring counterfeit copies, in that PEP would have received revenue from such sales.

137.    Because PEP has been denied this revenue, it has been damaged by Centennial's uses.

138.    On each occasion when Centennial permitted an accompaniment track pirated from another manufacturer to be played during a karaoke show, Centennial permitted the display of the words, names, and symbols of the other manufacturer in connection with Heisler's karaoke services.

139.    The display of these false designations of origin is likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be

deceived into believing, falsely, that the pirated tracks are legitimate, authorized, and authentic materials that Heisler acquired in a legitimate manner.

140.    The display of the false designations of origin is also likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the works being performed were sold those manufacturers and purchased by Heisler.

141.    Centennial's use of the false designations of origin in this fashion damages PEP by enabling Centennial, through Heisler, to provide karaoke entertainment services at a lower cost than persons who acquire those materials legitimately, including PEP's legitimate customers.

142.    The consequential denial of revenue from a legitimate market for PEP's customers' services prevents PEP's customers from making purchases of material from PEP and is thus a denial of revenue to PEP.   Nor did PEP authorize Centennial to make, acquire, or use reproductions, counterfeits, or copies, or to use the SOUND CHOICE Marks in connection with the karaoke shows provided at its lounge.

143.    Because PEP has been denied this revenue, it has been damaged by Centennial's false designations of origin relating to other manufacturers.

144.    In addition, because the imitation tracks still bear the SOUND CHOICE trademarks and use the protectable trade dress, when the tracks are used, the SOUND CHOICE trademarks and trade dress are broadcast, published, and advertised to the general public or specific market segment to advertise Centennial's goods, products or services for the purpose of attracting customers or supporters. This provided further financial gain to Centennial.

145.    Unless enjoined by the Court, Centennial's unfair competition activities as described above will continue unabated and will continue to cause harm to PEP.

**SEVENTH CLAIM FOR RELIEF**
**ILLINOIS DECEPTIVE TRADE PRACTICES ACT**
**AGAINST DEFENDANT CENTENNIAL LANES, INC.**

146.    PEP repeats and incorporates by reference herein its allegations contained in the above paragraphs of this Complaint.

147.    Centennial hired Heisler to provide commercial karaoke services at its establishment, and it had the right and ability to control his use of authorized or counterfeit materials for said commercial purposes.

148.    Centennial permitted Heisler to engage in acts of infringement of the SOUND CHOICE Marks and the Trade Dress, in derogation of PEP's common law and statutory rights in those marks.

149.    Heisler's acts of infringement occurred during the conduct of trade or commerce, from which Centennial derived an economic benefit.

150.    Centennial enabling Heisler's acts of infringement constitute unfair or deceptive acts or practices within the meaning of 815 ILCS § 510/1 et seq.

151.    Centennial enabling Heisler's acts of infringement caused likelihood of confusion or of misunderstanding as to affiliation, connection, or association with or certification by PEP. Nor did PEP authorize Centennial to make, acquire, or use reproductions, counterfeits, or copies, or to use the SOUND CHOICE Marks in connection with the karaoke shows provided at its lounge.

152.    As a direct and proximate result of each of Heisler's acts of infringement and Centennial's encouragement thereof, PEP has suffered a pecuniary loss, including the loss of revenue associated with sales or distribution of compact discs to karaoke jockeys, commensurate with the demand for the contents of those discs, which revenue would have been received but for

Heisler's acts in creating or acquiring counterfeits of SOUND CHOICE-branded accompaniment tracks.

153.    As such, PEP has been damaged and is likely to be further damaged by a deceptive trade practice of Heisler, aided by Centennial's encouragement, within the meaning of 815 ILCS § 510/3.

154.    Unless enjoined by the Court, Heisler's unfair competition activities, aided by Centennial's encouragement, as described above will continue unabated and will continue to cause harm to PEP.

**EIGHTH CLAIM FOR RELIEF**
**COMMON LAW UNFAIR COMPETITION**
**AGAINST DEFENDANT CENTENNIAL LANES, INC.**

155.    PEP repeats and incorporates by reference herein its allegations contained in the above paragraphs of this Complaint.

156.    On each occasion when Centennial permitted a SOUND CHOICE-branded accompaniment track to be played during a karaoke show, Centennial permitted the display of the SOUND CHOICE Marks in connection with Heisler's karaoke entertainment services.

157.    The display of the SOUND CHOICE Marks is likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that PEP sponsored or approved Centennial's services and commercial activities.

158.    The display of the SOUND CHOICE Marks is also likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the works being performed were sold by PEP and purchased by Heisler for use in providing karaoke entertainment services in a venue of Centennial's.

159.     Centennial's use of the SOUND CHOICE Marks in this fashion would have inured to the benefit of PEP if Heisler had legitimately acquired genuine SOUND CHOICE discs instead of counterfeiting them or acquiring counterfeit copies, in that PEP would have received revenue from such sales.

160.     Because PEP has been denied this revenue, it has been damaged by Centennial's uses.

161.     On each occasion when Centennial permitted an accompaniment track pirated from another manufacturer to be played during a karaoke show, Centennial permitted the display of the words, names, and symbols of the other manufacturer in connection with Heisler's karaoke services.

162.     The display of these false designations of origin is likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the pirated tracks are legitimate, authorized, and authentic materials that Heisler acquired in a legitimate manner.

163.     The display of the false designations of origin is also likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the works being performed were sold by those manufacturers and purchased by Heisler. Nor did PEP authorize Centennial to make, acquire, or use reproductions, counterfeits, or copies, or to use the SOUND CHOICE Marks in connection with the karaoke shows provided at its lounge.

164.     Centennial's use of the false designations of origin in this fashion damages PEP by enabling Centennial, through Heisler, to provide karaoke entertainment services at a lower cost than persons who acquire those materials legitimately, including PEP's legitimate customers.

165.    The consequential denial of revenue from a legitimate market for PEP's customers' services prevents PEP's customers from making purchases of material from PEP and is thus a denial of revenue to PEP.

166.    Because PEP has been denied this revenue, it has been damaged by Centennial's false designations of origin relating to other manufacturers.

167.    Unless enjoined by the Court, Centennial's unfair competition activities as described above will continue unabated and will continue to cause harm to PEP.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff PEP prays for judgment against Brian Heisler d/b/a Your DJ Pros and Centennial Lanes, Inc. that the Court:

A.    Find that Heisler and Centennial committed acts of infringement, including but not limited to counterfeiting, of the federally registered SOUND CHOICE Marks and of the Trade Dress;

B.    Find that Heisler and Centennial engaged in unfair competition detrimental to PEP in violation of 15 U.S.C. § 1125(a);

C.    Enter judgment against Heisler and Centennial and in favor of PEP on all applicable counts;

D.    Find the activities of Heisler and Centennial were in all respects conducted willfully and for profit;

E.    Award to PEP the profits of Heisler and Centennial and the damages sustained by PEP because of the conduct of Heisler and Centennial in infringing the SOUND CHOICE Marks, the SOUND CHOICE Trade Dress, or both, or, in the alternative, statutory damages per trademark infringed by counterfeiting, and in any event in an amount not less than $50,000 for each

establishment in which the infringement occurred, and in the amount of $50,000 from each of the Defendants;

F.     Award to PEP the profits of Heisler and Centennial and the damages sustained by PEP because of Heisler's acts of unfair competition under 15 U.S.C. § 1125(a), and in any event in an amount not less than $50,000 for each establishment in which the infringement occurred, and in the amount of $50,000 from each of the Defendants;

G.     Award to PEP treble, punitive, or otherwise enhanced damages, as available, for acts of willful infringement by and in the amount of $50,000 from the venue Defendant;

H.     Grant PEP preliminary and permanent injunctive relief against further infringement of the SOUND CHOICE Marks by Heisler and Centennial;

I.     Award PEP its costs suit and attorney fees, to the extent not awarded above; and

J.     Grant PEP such other and further relief as justice may require.


DATED: December 10, 2015                    Respectfully submitted,

                                            By:     /s/ Keith A. Vogt
                                            Keith A. Vogt (Bar No. 6207971)
                                            1033 South Blvd, Suite 200
                                            Oak Park, IL  60302
                                            Telephone: 708.203.4787
                                            E-Mail: keith@vogtip.com


                                            ATTORNEY FOR PLAINTIFF